# Byrne v. Mercy Health System of Southeastern Pennsylvania

450

C.P. of Delaware County, no. 98-15864.

*Keith S. Erbstein,* for plaintiff.

*Christine McCafferty,* for defendants Mercy Health System of S.E. Pa. and Mercy Community Hosp.

*Richard R. Galli* and *Kim Kocher,* for defendants Lisberger and Marple Medical Associates.

BURR II, *J.,* July 19, 2002—The defendants Mark Lisberger M.D. and Marple Medical Associates Inc. only, appeal from the judgment entered in the above-captioned medical malpractice wrongful death and survival action alleging that the defendants' negligent failure to diagnose and treat the coronary artery disease of plaintiff's decedent, Mary F. Byrne, caused her death. Judgment was entered following entry of the order denying the defendants' motion for post-trial relief seeking judgment n.o.v. or a new trial.

On April 15, 1998, at 10:42 p.m., Mary Byrne, age 55, presented to the emergency room of Mercy Community Hospital in Haverford, Delaware County, Pennsylvania, complaining of the sudden onset of intermittent substernal chest pain that she said she had been experiencing for the previous 36 hours. Mrs. Byrne described the pain as a squeezing sensation and characterized it as severe at times, or a "nine" on a scale of one to 10. Following an electrocardiogram with results reported as "normal," and some blood work, Mrs. Byrne was administered nitroglycerine, which relieved her pain. The defendant, Dr. Lisberger, a cardiac consultant to the hospital, was called, and after reviewing her test results and examining Mrs. Byrne around 1 a.m. on April 16, decided to admit her to the hospital for further cardiac studies, including electrocardiograms, enzyme studies, and an exercise stress test with a nuclear scan component. The defendant's ini-

tial impression was that the patient had atypical chest pain that "was possibly cardiac in origin and possibly gastrointestinal" in origin. (Defendants' brief in support of post-trial motion, p. 2.)

It is undisputed that plaintiff's decedent had several major risk factors for coronary artery disease. She was obese, weighing 188 pounds, at five feet, five inches in height and smoked three packs of cigarettes per day. (7/5/00 N.T. 29, 34.) She had elevated cholesterol and triglycerides and was a borderline diabetic. Her father had died at age 55 from a myocardial infarction, and her mother had undergone bypass surgery. There is also no dispute that, after approximately five minutes on the treadmill while undergoing the stress test, Mrs. Byrne complained of significant fatigue and the test was terminated one minute later. Defendants claim that the results of all tests performed on Mrs. Byrne on April 16, 1998, including the stress test, were negative and/or normal, whereupon Dr. Lisberger determined that Mrs. Byrne could be discharged from the hospital that day, with the further thought that her symptoms derived from musculoskeletal difficulties. (Defendants' brief in support of post-trial motion, p. 2.) Mrs. Byrne reported some incidents of chest pain before leaving the hospital, but there is no evidence that these were reported to Dr. Lisberger. (Defendants' brief in support of post-trial motion, p. 2.) Indeed the defendants admitted through the testimony of their expert, Dr. Bruce Berger, that, at no time when she was actually experiencing chest pain in the hospital, was Mrs. Byrne in the process of being examined by a physician. (7/10/00 N.T. 42.)

Mrs. Byrne collapsed on her bathroom floor in the early morning hours of April 18, 1998, and was transported to the defendant hospital where she was pronounced dead at 5:20 a.m. An autopsy performed by the Delaware County medical examiner, Dr. Dmitri L. Contostavlos M.D., the following morning, April 19, 1998, determined the cause of death to have been coronary artery disease with significant narrowing of the left anterior descending coronary artery and left circumflex artery which, having been blocked by a clot, caused an infarction.[1] (7/5/00 N.T. 21-25.) This was followed by a rupture in the heart wall in the supply area of the circumflex branch which had weakened due to the infarction. (7/5/00 N.T. 20-21.) The rupture had caused a tamponade, or bleeding into the pericardium (the sac around the heart), creating pressure on the heart and preventing it from pumping, and causing immediate death. (7/5/00 N.T. 21, 40.) In Dr. Contostavlos' opinion, the estimated time period between rupture and death was between one-half hour and 45 minutes. (7/5/00 N.T. 41.)

The plaintiff initiated this lawsuit, alleging that after decedent presented at the emergency room of the defendant hospital with a sudden onset of intermittent chest pains, she was diagnosed as having suffered a possible heart attack and was admitted and prescribed diagnostic

---

1. "Infarction" or the interchangeable term, "infarct," is defined in Stedman's Medical Dictionary, 25th Ed. (Baltimore, Md., 1990), as "sudden insufficiency of arterial or venous blood supply due to emboli, thrombi, vascular torsion or pressure, that produces a macroscopic area of necrosis." "Necrosis" is defined in Stedman's as "pathological death of one or more cells, or of a portion of tissue or organ, resulting in irreversible damage."

testing for the next day after the defendant, Dr. Lisberger, had been brought in for consultation. (Complaint, ¶¶10-11.) Plaintiff charged the defendants with negligence in the failure to appropriately interpret the results of Mrs. Byrne's diagnostic tests so as to diagnose her coronary artery disease; in the failure to promptly and properly perform diagnostic studies, such as a heart catheterization; and in the failure to conform to acceptable standards of medical care in the diagnosis, treatment and management of Mrs. Byrne, including the failure to assure that she underwent necessary treatment for her coronary artery disease. (Complaint, ¶¶17-18.) The defendants, in their answer to plaintiff's complaint, simply denied all averments of negligence or deviation from the applicable standard of care in the referenced conduct of Mrs. Byrne's case. (Answer, ¶¶17-18.) Defendants pleaded the same in new matter, and averred the defenses of contributory/comparative negligence, assumption of the risk, that the cause of death was the result of an unspecified underlying medical condition of Mrs. Byrne, or was caused by other persons over whom the defendants exercised no control or right of control. (Answer, ¶¶31-33.) The defendants' claim of contributory/comparative negligence was withdrawn at trial. (7/5/00 N.T. 277.)

Plaintiff presented Dr. Contostavlos, who was qualified as an expert in the field of forensic pathology, as his first trial witness. (7/5/00 N.T. 9.) Dr. Contostavlos testified that, prior to the autopsy, he had obtained a report of the circumstances of Mrs. Byrne's cause of death, "probably" from the family, or conceivably from the hospital, he could not say for certain. (7/5/00 N.T. 13.)

The witness' uncertainty of the source of this history was later noted by the defendants for the record. (7/5/00 N.T. 31.) Dr. Contostavlos said that part of that report indicated that unnamed "physicians" believed that Mrs. Byrne's pain resulted "when she grabbed a rail and when she tripped while descending the stairs on the 8th of April." (7/5/00 N.T. 14.) The witness said that his own initial belief was that Mrs. Byrne had died of heart disease, "[b]ecause of the symptoms she exhibited and the mere fact of sudden death were very suggestive of a heart disease death." (7/5/00 N.T. 14.)

Dr. Contostavlos reported that examination of the decedent's upper lung lobes showed a "moderate or marked" degree of emphysema, a condition which would cause her lung function to decrease somewhat, "and there might be some degree of shortness of breath upon exertion," and a "diminution in her capacity for exercise." (7/5/00 N.T. 16-18.) After providing his opinion as to cause of death, Dr. Contostavlos gave direct testimony, without objection from the defendant, that he believed the age of the infarct, or blockage of the artery which led to Mrs. Byrne's death at 5 in the morning of April 18th, was "between two to five days," depending on the body's "defense mechanism or its attempt to healing [sic] and to remove dead tissue." (7/5/00 N.T. 26-27.) Dr. Contostavlos then testified that this was a "very conservative estimate, two to five days," and that he believed it was "actually closer towards the longer end than the shorter end." The witness said he had come to this estimate by "examining the tissues and seeing the staging of the reactive changes," and by considering that this was the usual amount of time that elapses between an infarc-

tion and the softening of tissue that leads to a rupture, "which is usually a week, after the infarction." (7/5/00 N.T. 27-28.) When asked by plaintiff's counsel "how closer to the longer" was the range, Dr. Contostavlos replied, "I would favor from four to five days." (7/5/00 N.T. 28-29.) The witness explained that death was preceded by some hardening of the decedent's arteries, a tendency either inherited or brought about by risk factors, such as smoking, lack of exercise, obesity, and eating "a high fat rich food" [sic]. (7/5/00 N.T. 29.) Dr. Contostavlos went on to say that when the arteries become critically narrowed, death is caused by softening of heart muscle which softens further and eventually bursts. (7/5/00 N.T. 30.) When asked how the bursting causes sudden death, Dr. Contostavlos replied that if there is a sudden leakage of blood through a crack or slit in the muscle, the blood will fill the surrounding sac, limiting the capacity for the heart to compress, and rendering it unable to pump. (7/5/00 N.T. 30.) The witness said that this event is what is called a tamponade. (7/5/00 N.T. 30.)

The defendants' cross-examination of Dr. Contostavlos began with questions regarding decedent's emphysema, and moved on to the findings pertaining to her coronary artery disease. (7/5/00 N.T. 35-36.) Defendants established that it was the marginal branch of the left circumflex artery that had become occluded, causing the infarct, followed by the rupture. (7/5/00 N.T. 37-39.) Defendants' counsel then asked, "[a]nd what happened in Mrs. Byrne's case, then, was [on] Saturday morning, sometime immediately before her death, the thinned out or weakened [heart] tissue, dead from lack of blood sup-

ply, burst and the blood flowed into the pericardial sac surrounding the heart, causing a tamponade?" (7/5/00 N.T. 38-39.) Dr. Contostavlos replied that this was correct, and estimated the time between the rupture and Mrs. Byrne's death at between 30 and 45 minutes. (7/5/00 N.T. 41.) Under defendants' further questioning, the witness estimated the time between the infarct and the rupture to have been four or five days earlier, or to have occurred either on the morning of Tuesday, April 14, or Monday, April 13, 1998, respectively. (7/5/00 N.T. 43.) Defendants did not question Dr. Contostavlos, nor proffer hypothetical questioning, regarding any impact the results of the enzyme or other diagnostic testing performed on Mrs. Byrne at the hospital would have had on that opinion. There is no dispute that Dr. Contostavlos' opinion rested on his examination of Mrs. Byrne's tissues alone, and was not combined with study or review of any of her medical records or test results. It is also clear in the record that this witness was uncertain as to the source of the anecdotal medical history imparted to him at the time of the autopsy, whether it was from trained hospital personnel or from the decedent's family members, none of whom were medical professionals.

Plaintiff also presented the testimony of Karen A. Kelly, the technician employed in the cardiology department of Mercy Hospital, who had assisted the defendant, Dr. Lisberger, in performing the treadmill stress test on Mrs. Byrne at approximately 10 a.m., on the morning of April 16, 1998.[2] (7/5/00 N.T. 48-57.) The witness testi-

---

2. A discrepancy between the recorded time of the conclusion of the stress test on Dr. Lisberger's report as approximately 11:15 a.m., on April 16, 1998, and as 10:09 a.m. on that date on the computer

fied that Dr. Lisberger had ordered the decedent to be evaluated using a measure known as the Bruce Protocol instead of a more gradual protocol that would have taken her age, obesity and emphysema into consideration. (7/5/00 N.T. 61-62.) Ms. Kelly indicated that the Bruce Protocol is conducted in six stages, with increasing gradations of speed and incline of the treadmill, each lasting for three minutes, with herself monitoring the electrocardiogram results and the decedent's blood pressure for each stage or grade. (7/5/00 N.T. 65.) Ms. Kelly testified that Mrs. Byrne had complained to her of chest pains before the test was administered, but that she hadn't reported this in the hospital record because such complaints were "common" from people waiting to take stress tests. (7/5/00 N.T. 78-79, 92, 94.) Ms. Kelly testified that she did have an additional report from the nuclear scan technician, Kathy Baselice, which stated that Mrs. Byrne had complained of chest pain while waiting to come to the heart station for the stress test, and that Ms. Baselice had reported the complaint to the defendant. (7/5/00 N.T. 84-85, 88-89, 92.)

Ms. Kelly testified that Mrs. Byrne was able to walk only six of the 18 minutes of the stress test, and that the speed of the treadmill had been manually slowed by the defendant during the second minute of the second stage of the protocol because the patient had fatigued. (7/5/00 N.T. 66-68, 73.) At the conclusion of five minutes on the treadmill, Mrs. Byrne was injected with the nuclear iso-

printout for the test was explained by the defendant as having been attributable to a failure to reset the computer's clock to daylight saving time after the changeover on April 5 of that year. (7/7/00 N.T. 50-51; 7/10/00 N.T. 21; trial exhibits DL-3, DL-10, and DL-17.)

tope, Cardiolite, and walked an additional minute on the treadmill in order for the Cardiolite to circulate through her blood stream. (7/5/00 N.T. 71-73.) Ms. Kelly testified that a stress test will normally conclude when the patient's predicted maximum heart rate, as determined by a chart posted in her work area, is reached. (7/5/00 N.T. 70.) Mary Byrne's predicted maximum heart rate was 165, according to that chart. (7/5/00 N.T. 58.) While the reason noted for the termination of Mrs. Byrne's stress test was "fatigue," Ms. Kelly indicated that Mrs. Byrne's heart rate at the conclusion of the test was 164, but said the test would have been valid, in any event, after Mrs. Byrne had achieved a heart rate of 85 percent of her predicted maximum heart rate, or 140 beats per minute. (7/5/00 N.T. 67-68, 123-25, 144; trial exhibits DL-2 through 5.)

Plaintiff next presented the testimony of Kathleen Baselice, the nuclear medicine technician, who injected the Cardiolite radioactive isotope into Mary Byrne's bloodstream before the treadmill stress test, and during the final minute thereof, for scanning of "rest" and "stress" images, respectively, by a camera designed for that purpose. (7/5/00 N.T. 203-208, 211-13; trial exhibit P-4.) This witness testified that, after decedent had been given her first injection of Cardiolite and asked if she'd been given anything to eat or drink, Mrs. Byrne reported that she was experiencing chest pains of the same type and intensity that had led her to come to the hospital. (7/5/00 N.T. 214-15.) Ms. Baselice said, however, that she had not inquired into, nor checked the type or character of the pain, nor had she entered the complaint into Mrs. Byrne's hospital chart. (7/5/00 N.T. 215-19.) The wit-

ness said she did, nevertheless, think it significant enough to warrant a call to the cardiology department and left a message with the hospital telephone operator for someone there to contact her immediately. (7/5/00 N.T. 218-20.) Ms. Baselice recalled that she was contacted a couple of minutes later by the defendant, who asked to see Mrs. Byrne's EKG, whereupon she took it to him in the heart station. (7/5/00 N.T. 220-21.) The witness reported that, after examining the decedent's EKG report, defendant told her to continue with the test. (7/5/00 N.T. 221-22.) Ms. Baselice agreed that a complaint of squeezing substernal chest pain on a scale of nine to 10 was a counterindication for someone who's about to have a stress test, but insisted that it was not her decision to make. (7/5/00 N.T. 223.) After stating that she didn't recall whether the decedent had made two further complaints of chest pain during the 45-minute period in her presence before the stress test was administered, Ms. Baselice's deposition testimony of March 21, 2000, was introduced. (7/5/00 N.T. 228-29.) The deposition transcript adduced that such a statement had been made. (7/5/00 N.T. 229-30.) Ms. Baselice said she did not report these complaints on the hospital chart either. (7/5/00 N.T. 232.)

Plaintiff proffered the testimony of Dr. Edward K. Chung as his sole expert in the field of cardiology, stress testing and the interpretation of electrocardiograms. (7/6/00 N.T. 19.) Dr. Chung indicated that he had reviewed Mary Byrne's entire hospital record, the electrocardiograms and stress testing EKG tracings, and the depositions of hospital personnel in reaching his opinion that the defendants had failed to achieve the requi-

site standard of care in "treating patients for the cardiology conditions such as Mrs. Byrne had." (7/6/00 N.T. 20-21.) Dr. Chung testified that the risk factors of Mrs. Byrne combined with her presenting to the emergency room with intense, intermittent, substernal chest pain described as of a squeezing sensation of a duration of 36 hours, and nine on a scale of one to 10, without even examining the patient, should have led to a diagnosis of coronary artery disease. (7/6/00 N.T. 21-33.) Dr. Chung said that whether "typical" or "atypical," or "exertional" or "nonexertional" Mrs. Byrne's symptoms were "typical" enough to warrant such a diagnosis, rather than the differential diagnosis of gastrointestinal disorder and/or musculoskeletal injury arrived at by the defendants. (7/6/00 N.T. 32-33.) Dr. Chung stated that intermittent chest pain in combination with Mrs. Byrne's risk factors does evince coronary artery disease, in contrast to the position taken by the defendants that such pain should be continuous. (7/6/00 N.T. 145-46.)

The witness testified that he could find no evidence in the hospital record to consider muscular skeletal disorder or gastrointestinal disease as the cause of Mrs. Byrne's chest pains. (7/6/00 N.T. 34-36.) Dr. Chung reported that partial relief such as occurred from the administering of nitroglycerine to Mrs. Byrne is common in someone who has significant coronary artery disease. (7/6/00 N.T. 38-39.) He opined that the defendant delayed the diagnostic and therapeutic process unnecessarily in trying to differentiate a diagnosis between gastrointestinal disease and musculoskeletal injury. (7/6/00 N.T. 40.) Dr. Chung also stated that Mrs. Byrne should not have been given a stress test because she was experiencing chest pain at

the time. (7/6/00 N.T. 53-54, 128, 152.) Dr. Chung noted that many obese patients like Mrs. Byrne cannot perform a proper stress test that would induce symptoms of cardiac change leading to a proper diagnosis, because they become fatigued. (7/6/00 N.T. 45-49.) He also said that Mrs. Byrne should have been administered a slower stress test that would have allowed her to exercise to the point where myocardial ischemia would have been induced.[3] (7/6/00 N.T. 46-47, 78.) In Dr. Chung's opinion, reliance solely upon the maximum predicted heart rate resulted in a false negative finding of no heart disease for Mrs. Byrne. (7/6/00 N.T. 50-53.) In summary, Dr. Chung testified that, all of the foregoing being taken together, Mary Byrne should have been sent immediately to the heart catheterization lab for an angiogram to see which artery was narrowed or blocked, and, depending on the result, either a balloon angioplasty or bypass surgery subsequently performed. (7/6/00 N.T. 55.) Dr. Chung testified that, in his view, if the catheterization had been done, Mary Byrne would "be surviving." (7/6/00 N.T. 165-66.)

On cross-examination, the defendants elicited testimony from Dr. Chung that the two enzyme studies done on Mrs. Byrne at the hospital showed no signs of a heart attack because there was no elevation of proteins in the blood evincing destruction of heart muscle tissue. (7/6/00

---

3. "Ischemia" is defined in Stedman's Medical Dictionary, 25th ed. illus. (Baltimore, Md., 1990), as "local anemia due to mechanical obstruction (mainly arterial narrowing) of the blood supply," and "myocardial ischemia" as "inadequate circulation of the blood to the myocardium, [or middle layer of the heart, consisting of heart muscle], usually as the result of coronary artery disease."

N.T. 66-67; trial exhibit DL-6.) Dr. Chung then related on two occasions upon questioning by the defendant that there were no signs from the laboratory evidence or in the hospital record that Mrs. Byrne had suffered a heart attack before leaving the hospital. (7/6/00 N.T. 68-69, 125-26.) The witness also stated that he was not criticizing the defendant for failure to diagnose a heart attack. (7/6/00 N.T. 68-69.)

The defendant, Dr. Lisberger, a non-invasive cardiologist, presented himself as an expert in that field, and gave his opinion that he had not deviated from the acceptable standard of care in giving Mrs. Byrne a stress test instead of referring her for a heart catheterization study. (7/7/00 N.T. 58-59.) The defendant first testified that the purpose of conducting enzyme studies is that, during a heart attack, certain cardiac enzymes are released as a result, and studies of the level of these in the bloodstream will show whether or not someone is having a heart attack. (7/5/00 N.T. 208-209.) The defendant described heart catheterization as a risky invasive procedure, and described his own work as engaging in diagnostic studies that are not invasive in nature. (7/6/00 N.T. 211-15.) Dr. Lisberger stated that persons who should not be administered stress tests are those with severe aorta stenosis, severe arrhythmias, and severe congestive heart failure. (7/6/00 N.T. 216-17.) When asked if the presence of chest pain was a reason not to do a stress test, the defendant replied that chest pain, in fact, is the reason for doing a stress test. (7/6/00 N.T. 217.) The defendant said that he saw no reason to do a heart catheterization on Mrs. Byrne after a 13 and a half, or possibly 15, minute examination of her at the hospital, because she was ex-

periencing no chest pains, and showing a normal EKG and normal enzymes at the time, and she was "sitting there having no symptoms." (7/6/00 N.T. 226-29, 288; 7/7/00 N.T. 125.) Dr. Lisberger testified that if Mrs. Byrne had been having an acute myocardial infarction when she entered the hospital, "you limit the damage, let's say, by giving some of these clot busting agents that we give to patients coming in with heart attacks," and if those didn't work, that would be an indication to do an emergency catheterization. (7/6/00 N.T. 229.) The defendant went on to admit that, at the time he saw the patient, there was no evidence from any source that she had experienced a heart attack, and that he would not have done a stress test if her enzymes had been abnormal, because this would have meant that she had already had a heart attack. (7/6/00 N.T. 229-30, 273.)

The defendant testified further that, if Mrs. Byrne were having a heart attack, she would have been having pain at the time of a character of overwhelming severe pressure or heaviness in the chest radiating up into the neck and jaw, often associated with nausea, vomiting and sweating. (7/6/00 N.T. 230-31.) The witness stated that, unlike Mrs. Byrne's symptoms, "you don't have pain that comes and goes with a heart attack" or periods of no discomfort, "[y]ou're in distress." (7/6/00 N.T. 230-31.) The defendant reported that Mrs. Byrne's chest pain was atypical for a diagnosis of coronary artery disease because, although it was substernal, it hadn't come on due to exertion or stress, and it hadn't been relieved with rest or nitroglycerine, adding as to the latter, despite his prescription for this medication in the hospital record, and the patient's reports to the contrary, "[w]e didn't have

any information on that." (7/6/00 N.T. 268-69, 277.) In fact, the nurses' notes maintained for Mrs. Byrne during her stay in the hospital reflect that she was given nitroglycerine for chest pain at 2:20 a.m., 2:55 a.m., and 6:30 a.m. on the morning of April 16, 1998, and that her pain was relieved or partially relieved by this medication. (7/6/00 N.T. 37-39; 7/7/00 N.T. 10-11; trial exhibit DL-8.) Dr. Lisberger testified, however, that he had not read these notes, nor was he aware that the patient had reported to hospital personnel that she had experienced chest pain with the intensity of nine on a scale of one to 10, or of seven, using the same scale, adding that he doesn't use a scale when he determines how bad a patient's chest pain may be. (7/7/00 N.T. 12, 26.) The defendant said he couldn't recall, but that Mrs. Byrne, "probably did tell me" that she did get nitroglycerine. (7/7/00 N.T. 175.)

The defendant testified that one report from Mrs. Byrne that her chest pain felt "hot and burning," was what led him to pursue a differential diagnosis of gastrointestinal disease. (7/6/00 N.T. 232-34, 248, 270; 7/7/00 N.T. 148-49.) The defendant indicated that whether he had read the report that Mrs. Byrne's chest pain was "squeezing," and contrasting that sort of pain with the patient's report to him that the pain was "hot and burning," was not significant in the decision to conduct the stress test because the pain was atypical in that it was non-exertional. (7/7/00 N.T. 148-49.) The defendant said he never considered catheterization to be necessary in light of Mrs. Byrne's risk factors, because "she was having no symptoms at the time" and was showing "no signs of distress at all." (7/6/00 N.T. 252-53.) Dr. Lisberger testified that neither did the fact that Mrs. Byrne had been

administered nytroglycerine for chest pain make a difference as to whether he was going to perform the stress test. (7/6/00 N.T. 217.) The defendant repeatedly emphasized that the reports of chest pain were thus disregarded, because "that was why she was in the hospital so we could do the stress test and to evaluate her chest discomfort." (7/6/00 N.T. 217; 7/7/00 N.T. 11-12, 18.) When questioned regarding his instructions for the decedent to be prescribed Advil, a non-inflammatory pain reliever on discharge from the hospital, the defendant could not say that this was to ease what he came to refer to interchangeably as "questionable muscle pain" or "atypical chest pain" because, "I wasn't sure what she had, and I thought she could try that" (7/7/00 N.T. 158-60, 162.) The defendant went on to say that his final analysis of the decedent's condition was that she had "atypical chest pain, and I didn't know the cause of the pain with any kind of certainty, although I had ruled out its being ischemic coronary insufficiency. (7/7/00 N.T. 159.)

When questioned about Dr. Contostavlos' testimony that Mrs. Byrne's heart attack may have occurred a day or two days before she had entered the hospital, the defendant responded that he had had an "epiphany" before coming to court that morning, and that "it all makes sense now." (7/7/00 N.T. 54, 85.) The defendant then speculated that if a heart attack had occurred some 24 to 48 hours before a patient came to the emergency room, an EKG could be normal even though someone has suffered a heart attack; muscle enzymes could have dissipated in the body; and the location of the heart attack might not have been visible on the ultrasound or on the Cardiolite scan. (7/7/00 N.T. 54-57.) This testimony was

presented without certainty, nor reference to accepted scientific study or literature, nor to study of the tissue in question. The conclusion as to what might be invisible on a Cardiolite scan might be credible as to its failing to show a scar or scarring on the decedent's heart, but is belied by the defendant's own testimony that the Cardiolite scan showed also that Mrs. Byrne's heart was beating, or "squeezing" normally. (7/7/00 N.T. 42-43.) Defendant had further testified in reference to the Cardiolite scan that, if heart muscle had been weakened or damaged by a heart attack, its depth contraction would be lowered because the heart muscle would be gone. (7/7/00 N.T. 42-43.) However, according to Dr. Lisberger, Mrs. Byrne's heart showed no signs of lowered depth contraction, and he insisted that Mrs. Byrne's Cardiolite scan was clearly a "normal study." (7/7/00 N.T. 42-43, 45.) This testimony is in direct contradiction to the defendant's newly formulated opinion that Mrs. Byrne's heart had already been irreversibly and terminally damaged some twenty-four hours before she had ever entered the emergency room of the defendant hospital. (7/7/00 N.T. 57.) Defendant's "epiphany" is also contradicted by his testimony that a finding by the discharging physician of a decrease in the uptake of Cardiolite in the anterior lateral portion of the patient's heart, the location of the heart attack, was fully explained as a "breast attenuation artifact." (7/7/00 N.T. 196-201.)[4]

---

4. The defendant left the hospital prior to Mrs. Byrne's discharge that afternoon, leaving instructions for a colleague, not a party to this lawsuit, to review the Cardiolite study and an echocardiogram conducted thereafter, and, if there were no indications of cardiac insufficiency indicated therein, to discharge the patient for him. (7/7/00 N.T. 215-21.)

The defendants presented Dr. Bruce G. Berger, also a non-invasive cardiologist, as their non-party expert "familiar with the standards of care applicable to clinical cardiology, with particular reference to the assessment of the patient with chest pain, to the assessment of a patient with coronary artery disease, applicable to the standard of care in reference to the indications for, the performance of, and the interpretation of, stress tests." (7/7/00 N.T. 227-28, 235-36.) Dr. Berger's opinion was that the defendant had acted entirely within the standard of care "for evaluating patients who have chest pain of undetermined etiology, in trying to decide what the cause of that pain is." (7/7/00 N.T. 247.) Like the defendant, this expert stressed the alleged atypicality of Mrs. Byrne's chest pain for not being precipitated by exertion, for going away with changes in body position, and for not radiating from its source. (7/7/00 N.T. 249.) The witness conceded that "while it is certainly possible that pain like [Mrs. Byrne's] can come from the heart, it is by no means classic for pain which comes from the heart. . . . [and] in that sense, it was an atypical type of chest pain." (7/7/00 N.T. 249.) When questioned why the defendant did not deviate from the standard of care in not sending the patient for a heart catheterization, Dr. Berger replied:

"The usual indication to send someone for a cardiac catheterization immediately is a patient who is having chest pain which is associated with either electrocardiographic changes particularly what is called ST elevation. That means the patient is having a heart attack, or the patient is unstable in terms that their blood pressure is low, they are not making urine, they are not profusing in terms of their mental status. They have evidence of heart

failure, lung congestion. A chest X-ray that shows fluid in the lungs or some component of hemodynamic or blood pressure instability which implies that the patient is having a life threatening situation at that particular moment . . . but at this particular point in time, none of those factors were present. Her blood pressure was stable, she was warm, she was profusing. Her EKG was normal and the initial set of blood work was all normal. So there was nothing in this situation at that point in time which merited an emergency cardiac cath [sic]." (7/7/00 N.T. 250-51.)

In Dr. Berger's opinion, the echocardiogram and Cardiolite scan conducted on Mrs. Byrne showed that her heart was pumping properly before she was discharged from the hospital on April 16, 1998. (7/7/00 N.T. 264-65.) In the witness' view, all the standard non-invasive tests that the defendant could have performed, were "normal," and provided the decedent with an "excellent prognosis," making it "entirely appropriate" to discharge Mrs. Byrne and "evaluate her for other causes of chest pain." (7/7/00 N.T. 267.) Interestingly, the defendant asked no direct questions of this witness regarding Dr. Contostavlos' testimony regarding the timing of the infarct that led to Mary Byrne's death.

On cross-examination, Dr. Berger offered testimony that he believed that Mary Byrne's heart attack occurred after she left the hospital because the tests conducted during her hospitalization detected no damage to her heart and confirmed the same while she was being studied on April 15 and April 16, 1998. (7/10/00 N.T. 6-7.) The witness reported that all hospital electrocardiograms conducted on the decedent indicated that the regularity with

which her heart was beating was normal, and that there were no irregularities of rhythm detected, or else they would have been recorded on her chart. (7/10/00 N.T. 114-15.) Dr. Berger testified that the enzyme studies done on Mrs. Byrne overnight on April 16, 1998, indicated that she had not had a heart attack and that there was no active damage to her heart at that particular point. (7/10/00 N.T. 121.)

Dr. Berger agreed that the only reference in the hospital record evincing that Mrs. Byrne had complained that her pain was "hot and burning" came from the defendant, Dr. Lisberger. (7/10/00 N.T. 7-8.) Dr. Berger also agreed that nobody at the hospital, including the defendant himself, ever made any notation in the record that Mrs. Byrne had either a history of musculoskeletal problems or any physical findings associated with any musculoskeletal problems, and that the only such reference was made after her death by Dr. Contostavlos. (7/10/00 N.T. 16-19.) Dr. Berger admitted that, despite the defendant's insistence that Mrs. Byrne was experiencing no distress at the time of his examination of her, not one physician at the hospital examined the decedent while she was having chest pain, and that it is indeed advisable to examine patients during bouts of pain because there may be no evidence of coronary dysfunction during intervening periods. (7/10/00 N.T. 41-42, 76.) The witness admitted that he himself had written that the clinical utility of conventional exercise treadmill tests for the detection of coronary artery disease remains a controversial issue. (7/10/00 N.T. 62.) Dr. Berger was not asked to give an opinion regarding the autopsy report on direct examination, but on redirect, testified that he had not

looked at any of the autopsy tissue or slides before writing his expert report. (7/10/00 N.T. 83-84.)

The defense rested at the conclusion of Dr. Berger's testimony. It is important here to note that defendants made no motion for compulsory nonsuit at the close of plaintiff's evidence, nor a motion for directed verdict when the defendants rested their case. (7/6/00 N.T. 193; 7/10/00 N.T. 123.) Pa.R.C.P. 226, 230.1(c). It is further noted that the jury reached its verdict without raising any questions concerning conflicts in the testimony or in the opinions of any of the expert witnesses. (7/10/00 N.T. 243-50.)

At the conclusion of trial on July 11, 2000, the jury returned a verdict of causal negligence and awarded the plaintiff damages under the Wrongful Death Act in the amount of $172,250, and $356,800 in the survival action. (7/10/00 N.T. 248-50.) A poll of the jury at defendants' request revealed that one of the 12 members (juror no. 8) disagreed with the verdict of negligence. (7/10/00 N.T. 250-52.) The defendants raised no issue of record before the verdict was certified. (7/10/00 N.T. 255.) The defendants' timely filed motion for post-trial relief was denied. Plaintiff was awarded $31,257.43 in delay damages and the jury's verdict was molded to the sum of $560,307.43. Judgment was entered against the defendants in that amount upon praecipe of the plaintiff filed on July 2, 2001.

## WAIVER OF ISSUES ON APPEAL

Defendants initially raised in their motion for post-trial relief numerous issues that are not submitted in this

appeal. The motion for post-trial relief consisted of some 41 paragraphs, with allegations in the first three thereof that the verdict was against the law, the evidence, and unsupported by the weight of the evidence. Defendants questioned also the amount of the verdict under the Survival Act. (Defendants' motion for post-trial relief, ¶¶4-8, 33-37.) Defendants further averred that the court erred in refusing to grant a motion for directed verdict set forth in their requested jury instruction no. 1, based on alleged conflicts in the plaintiff's expert opinion evidence as to the time of the decedent's myocardial infarction. (Defendants' motion for post-trial relief, ¶¶9-10.) Defendants contended error in the court's permitting the jury to consider such evidence and allegedly to speculate regarding the timing of the infarction. (Defendants' motion for post-trial relief, ¶¶11-12.) Defendants additionally claimed error in the admission of allegedly irrelevant testimony from plaintiff's medical expert, Dr. Edward Chung, regarding the legal system, and in the restricting of testimony from the defendant, Dr. Lisberger, on matters related to the decedent's hospital admission. (Defendants' motion for post-trial relief, ¶¶13-16.)

Defendants claimed in their motion for post-trial relief that the court erred in permitting inappropriate comment, irrelevant and repetitive questions, inquiry into matters from outside the expert reports, expert testimony, and beyond the direct testimony of the defendant, Dr. Lisberger, plus the raising of previously unidentified liability issues by plaintiff's counsel, all during cross-examination of the defendant. (Defendants' motion for post-trial relief, ¶¶17-20, 22.) Defendants alleged that the court erred in suggesting that Dr. Lisberger had not provided a

responsive answer to a question, when, in defendants' view, plaintiff's counsel "was simply dissatisfied with the response." (Defendants' motion for post-trial relief, ¶21.) Defendants contended that the court erred in allegedly allowing plaintiff's actuarial expert to comment on nonexistent legal precedent and principles of the law, and in refusing to instruct the jury in accordance with defendants' proposed jury instructions regarding the making of calculations pertaining to personal maintenance expenses. (Defendants' motion for post-trial relief, ¶23-28.) Defendants alleged in their post-trial motion that the court gave erroneous instructions regarding use of the standard life expectancy table, because in defendants' view, the evidence adduced that decedent could not have had a normal life expectancy. (Defendants' motion for post-trial relief, ¶29-30.) Defendants claimed that the evidence and weight of the evidence does not support a finding of causal negligence. (Defendants' motion for post-trial relief, ¶¶31-32.) The concluding paragraphs of the motion for post-trial relief set forth allegations of juror misconduct, reservation of the right to add additional claims to these "assignments of error," and a request for the trial transcript. (Defendants' motion for post-trial relief, ¶¶38-41.)

Defendants confined argument submitted in their brief in support of the motion for post-trial relief solely to the issues of alleged inconsistency in the testimony of the medical examiner and of plaintiff's medical expert regarding the timing of Mrs. Byrne's myocardial infarction; to alleged comments by Dr. Chung regarding the legal system; to matters involving witness testimony and jury instruction pertaining to personal maintenance ex-

penses in calculating damages; and to rulings during the defendants' testimony. With the exception of argument surrounding the issue of conflict in the expert testimony, defendants' argument in support of the remaining issues was cursory and boilerplate. Further, following a brief hearing held on January 10, 2001, defendants dropped their contention of juror misconduct of alleged improper contact between a juror and a physician from Dr. Lisberger's medical practice during the trial. This is apparently so because the juror's hearing testimony evinced that the contact involved an innocuous social conversation between the parties, rather than discussion of the trial. (1/10/01 N.T. 6-19.)

Matters raised in post-trial motions must be supported by pertinent and appropriate legal argument or be deemed waived. *Frank v. Peckich,* 257 Pa. Super. 561, 391 A.2d 624 (1978); *Nimick v. Shuty,* 440 Pa. Super. 87, 100, 655 A.2d 132, 138 (1995); *Smith v. Penbridge Associates Inc.,* 440 Pa. Super. 410, 427 n.12, 655 A.2d 1015, 1024 n.12 (1995); *Gallagher v. Sheridan,* 445 Pa. Super. 266, 665 A.2d 485 (1995). Where appellant has failed to cite any authority in support of a contention, the claim is waived. *Gallagher v. Sheridan, supra;* see also, *Hercules v. Jones,* 415 Pa. Super. 449, 609 A.2d 837 (1992). Defendants have proffered only the issue regarding alleged conflicting testimony by plaintiff's experts in their statement of issues on appeal. Therefore, for all of the foregoing reasons, any additional issues that the defendants may attempt to raise or re-raise during this or any later stage of this litigation, should be deemed waived.

Despite the myriad of post-trial issues previously submitted for review, defendants have submitted only one

in their concise statement of matters complained of on appeal:

"When plaintiff presented contradictory expert testimony on a core issue in plaintiff's case concerning the timing of Mrs. Byrne's heart attack, did the court commit an error of law in permitting the jury to render a decision based on speculation?"

The ensuing discussion will demonstrate that there were no absolute contradictions in the essential conclusions of plaintiff's experts, when viewed against the testimony as a whole, which justified removal of this issue from the jury's consideration. Moreover, even if that were not the case, defendants have waived the right to raise any contention to the contrary.

## EXPERT TESTIMONY

The defendants contend that plaintiff's experts' testimony concerning the timing of Mrs. Byrne's heart attack was so contradictory, that it was error for the court to allow the jury to render a verdict allegedly based on speculation. It has been noted hereinabove that the defendants made no attempt whatsoever to stop the plaintiff's case from going to the jury on this basis or any other, nor did they raise such a contention until the filing of their post-verdict motion. The defendants did submit a proposed jury instruction allowing for the granting of a directed verdict, but never placed in the trial record their request for that instruction, nor was there an objection of record to its exclusion. It is axiomatic that to preserve an issue involving denial of a request for a jury instruction, unless otherwise allowed by the court,

the objection to such a ruling must be made before the jury retires, and must appear in the record. Pa.R.C.P. 227(b); Pa.R.A.P. 302(b). A matter not raised at the appropriate stage during trial may not be considered on appeal. *Dilliplaine v. Lehigh Valley Trust Co.,* 457 Pa. 255, 322 A.2d 114 (1974); *Taylor v. Celotex Corporation,* 393 Pa. Super. 566, 574 A.2d 1084 (1990). Defendants have waived this issue by their failure to raise this contention at a time when the court could have readily corrected the alleged error. *Dilliplaine v. Lehigh Valley Trust Co., supra.* Defendants cannot remain silent, taking their chances on what the verdict may be, and then complain afterward that it is adverse. *Boyle v. Steiman,* 429 Pa. Super. 1, 631 A.2d 1025 (1993), *appeal denied,* 538 Pa. 663, 649 A.2d 666 (1994).

Defendants argue that Dr. Contostavlos' opinion that Mrs. Byrne's heart attack occurred from two to five days before her death, with a preference for the infarct's occurring one to two days before she entered the hospital, and Dr. Chung's opinion that she did not suffer a myocardial infarction until after she left the hospital, so vitally disagreed as to neutralize each other. (Defendants' brief in support of post-trial motions, p. 9.) Defendants rely upon the cases of *Mudano v. Philadelphia Rapid Transit Co.,* 289 Pa. 51, 137 A. 104 (1927), and *Brannan v. Lankenau Hospital,* 490 Pa. 588, 417 A.2d 196 (1980), in support of this contention. Defendants argue further that Dr. Chung never stated a basis for his opinion that the heart attack occurred after Mrs. Byrne left the hospital. (Defendants' brief in support of post-trial motions, p. 11.) However, a review of the transcript clearly reveals that the asserted basis for Dr. Chung's opinion in

that regard was the results of the tests and studies conducted on the decedent, and that this testimony was elicited by the defendants themselves. (7/6/00 N.T. 66-69, 125-26; trial exhibit DL-6.) Defendants also raise a boilerplate contention that plaintiff was unable to establish causation for Mary Byrne's death because the jury would have been confused by the conflict between Dr. Contostavlos' testimony that the injury preceded the defendants' alleged negligence, and Dr. Chung's testimony that it did not. (Defendants' brief in support of post-trial motions, p. 11.) However, the record evinces on its face that Dr. Contostavlos never retracted his opinion that the myocardial infarction suffered by the decedent occurred from two to five days before her death, and that this assessment was based solely upon examination of the cardiac tissue. There is no dispute that Dr. Contostavlos never consulted with the defendant or any personnel at the hospital, nor reviewed any of the tests and studies corroborating plaintiff's claim that the heart attack occurred after Mrs. Byrne had left the hospital, in formulating his opinion.

The plaintiff in *Mudano v. Philadelphia Rapid Transit Co., supra,* alleged that an ulcerated heel followed an injury sustained at work. He presented two experts, one of which corroborated that claim, and another whose opinion was that the ulcer was caused by a blister brought about by an ill-fitting shoe some 16 months later. *Mudano v. Philadelphia Rapid Transit Co., supra,* 289 Pa. at 54-55, 137 A. at 105. The Pennsylvania Supreme Court held that, where a plaintiff calls more than one expert, there must be no absolute contradictions in their essential conclusions, and that they must not so vitally disagree on

essential points as to neutralize each other's opinion evidence. *Mudano v. Philadelphia Rapid Transit Co., supra,* 289 Pa. at 60, 137 A. at 107-108. The court also stated that minor points of disagreement between such experts should not be thus viewed. *Mudano v. Philadelphia Rapid Transit Co., supra,* 289 Pa. at 61, 137 A. at 108. In order for the instant case to involve the vital disagreement as to causation contemplated in the *Mudano* case, one of plaintiff's experts would have had to have opined that Mrs. Byrne's injury had an etiology in gastrointestinal or musculoskeletal causes, and the other that she died from defendants' negligent failure to diagnose and treat her coronary artery disease. Plaintiff here below did not present experts positing two completely independent and absolutely contradictory causes for the claimed injury, but experts who corroborated plaintiff's allegation that the decedent's death was caused by coronary artery disease. Moreover, Dr. Contostavlos was not presented, nor was he asked, to testify that Mary Byrne's death was caused by the defendants' negligence, but appeared to present evidence solely as to the cause of her death.

The question thus remaining is whether it was confusing for the jury to weigh testimony from Dr. Contostavlos that, although he posited the time of the infarct as occurring between two to five days before the time of death, and favored the fourth day as the time when the infarct occurred, with that of Dr. Chung that the decedent did not suffer her heart attack until after she left the hospital. Defendants present no evidence supporting this view, nor did they ever raise a claim at trial that this conflict was so substantial as to render the verdict a mere guess. *Baumgartner v. Pennsylvania R. R. Co.,* 292 Pa. 106,

140 A. 622 (1928). Further, the Pennsylvania Superior Court has held the *Mudano* rule inapplicable where the jury, there, as here, was charged that it was free to determine for itself the cause of plaintiff's death. *Valentine v. Federal Life Insurance Co.,* 111 Pa. Super. 311, 318, 169 A. 387, 389 (1933) (Coroner's testimony that death was caused solely by pneumonia, and expert's testimony that pneumonia was traumatically induced by plaintiff's being struck by automobile, presented no absolute conflict under *Mudano,* and the case was properly submitted to a jury charged that they were the ultimate finders of fact.)

Defendants rely also upon the case authority of *Brannan v. Lankenau Hospital, supra,* to support their contention that the conflict in plaintiff's experts' testimony caused a speculative verdict to be rendered in this case. *Brannan* involved claims of negligence in the perforation of the plaintiff's esophagus by a broken forceps during surgery to remove some meat that had become impacted in his throat, and in the failure to administer antibiotics thereafter. The court there held that equivocation by one of the plaintiff's experts as to whether the defendant physicians had failed to meet the standard of care presented no irreconcilable conflict for the jury to consider. *Brannan v. Lankenau Hospital, supra,* 490 Pa. at 596, 417 A.2d at 200. The court wrote further that,

"It is true we have previously held that a plaintiff's case will fail when the testimony of his two expert witnesses is so contradictory that the jury is left with no guidance on the issue, *Mudano v. Philadelphia Rapid Transit Co.,* 289 Pa. 51, 137 A. 104 (1927). . . . Indeed, since that decision, this court has allowed juries to con-

sider and resolve conflicts among expert witnesses. . . . Furthermore, we have held that conflicts in testimony are fatal only if absolute." *Brannan v. Lankenau Hospital, supra,* 490 Pa. at 596-97, 417 A.2d at 200. (citations omitted)

The case of *Shaw v. Sutliff,* 8 Phila. 379 (1982), offers vital instruction on this point. The plaintiff in *Shaw* charged the defendant physicians with negligent failure to detect his glaucoma at an earlier stage than the time in which it was discovered. The court held that it is not the burden of the plaintiff to prove the exact moment when he contracted glaucoma, stating that, in a civil action, the plaintiff's burden of proof is the preponderance of the evidence, not certainty. Similarly, the burden of the plaintiff here below was to show by a preponderance of the evidence whether the defendants were negligent in failing to timely detect the decedent's coronary artery disease and prevent her death. The evidence that she may have suffered a myocardial infarction prior to coming to the hospital clearly did not preponderate, nor was it certain as to the date when the infarct actually occurred. Defendants' suggestion that plaintiff had the burden of establishing the timing of his wife's heart attack in order to disallow his own claim of negligence, is simply contrary to law.

The defendants in *Shaw* also claimed that contradictory evidence presented by the plaintiff's expert witnesses neutralized their opinion pursuant to *Mudano, supra.* In *Shaw,* one of plaintiff's experts testified that he was suffering from histoplasmosis, and the other that he had contracted glaucoma. The court held that, unlike in

*Mudano,* where the experts blatantly contradicted each other as to whether the plaintiff's injury resulted from the conduct of the defendant, this disagreement did not present an unreasonable contradiction in the experts' ultimate conclusions that the vast majority of plaintiff's visual difficulty resulted from glaucoma. In the matter sub judice, there exists no absolute, blatant and unreasonable contradiction between Dr. Contostavlos' opinion that Mrs. Byrne may have suffered a myocardial infarction from two to five days prior to her death, and Dr. Chung's opinion that she suffered a heart attack after she left the hospital some two days before her death. Both of these experts ultimately concluded that death resulted from untreated coronary artery disease, and not from separate and independent causes altogether.

Moreover, the jury was instructed regarding its right to accept or reject the testimony of expert witnesses, as well as the bases for those opinions. (7/5/00 N.T. 9-10; 7/10/00 N.T. 202-208.) The jury was additionally instructed that, where they found that testimony of the experts conflicted, it was up to them to determine which of the conflicting testimony they would accept, if any. (7/10/00 N.T. 205.) The jury was further instructed that, if they found an irreconcilable conflict in the testimony of the expert witnesses, they "should consider also the other evidence that relates to the respective opinions which are in conflict . . . ." (7/10/00 N.T. 206.) Just prior to the conclusion of final instruction to the jury, the court convened a side-bar conference to entertain "exceptions, corrections, deletions, modifications or additions to the charge as given by the court." (7/10/00 N.T. 237-38.) Counsel for the defendants raised none pertaining to the instruction related to the expert witnesses, nor was there

482

a request from the defendants for an instruction allowing for a directed verdict, nor a motion raised in that regard during trial. (7/10/00 N.T. 237-38.)

It is respectfully suggested that, for all of the foregoing reasons, when viewed against the testimony as a whole, there were no absolute contradictions in the essential conclusions of plaintiff's experts which justified removal of this issue from jury consideration. Even if that were not the case, defendants have waived this contention from further consideration on appeal.